UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DAVID C. MARTIN,

                         Plaintiff,

        -v-                                              7:14-CV-1115

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                   OF COUNSEL:

CONBOY, MCKAY LAW FIRM                          LAWRENCE D. HASSELER, ESQ.
Attorneys for Plaintiff
307 State Street
Carthage, NY 13619

OFFICE OF REGIONAL GENERAL COUNSEL              DANIEL R. JANES, ESQ.
    SOCIAL SECURITY ADMINISTRATION              Special Ass't United States Attorney
    REGION II
Attorneys for Defendant
26 Federal Plaza, Room 3904
New York, NY 10278

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

        Plaintiff David Martin ("Martin" or "plaintiff") brings this action, pursuant to 42

U.S.C. §§ 405(g) and 1383(c)(3), seeking review of defendant Commissioner of Social

Security's ("Commissioner" or "defendant") final decision denying his application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  The parties have filed

their briefs as well as the Administrative Record on Appeal and the motions will be considered on the basis of these submissions without oral argument.[1]

## II. **BACKGROUND**

On June 4, 2007, Martin initially filed applications for DIB and SSI alleging that his anxiety disorder and cervical radiculopathy had rendered him disabled beginning on January 8, 2007. R. at 108, 110.[2]

Martin's consolidated claim was initially denied on August 29, 2007. R. at 70-71. At plaintiff's request, a hearing was held before Administrative Law Judge ("ALJ") Elizabeth Koennecke on September 3, 2009. Id. at 26-62. Plaintiff, represented by attorney, appeared and testified. Id.

On October 19, 2009, the ALJ issued a written decision denying Martin's application for benefits, which became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. R. at 1-3, 7-20.

Martin timely sought judicial review of the Commissioner's unfavorable decision. While that federal court action remained pending, plaintiff filed a second application for benefits covering a time period beginning on April 1, 2011. R. at 734. This second application resulted in a fully favorable award of benefits from that date forward. Id. at 730-32.

Thereafter, Martin's appeal of his initial denial of benefits, which covered a period of time between January 8, 2007 and March 31, 2011, was remanded for further administrative

---

[1] Pursuant to General Order No. 18 of the Northern District of New York, consideration of this matter will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

[2] Citations to "R." refer to the Administrative Record.

proceedings. Martin v. Astrue, 2012 WL 4107818 (N.D.N.Y. Sept. 19, 2012) (McAvoy, S.J.). Specifically, the Court concluded that

> [a]lthough this Court must give deference to the Commissioner's decision, the present record leaves open the question of whether Plaintiff's work capacity is significantly diminished by the nonexertional impairments posed by his dizziness and daily treatment regime such to limit his ability to find meaningful employment opportunities in the national economy. Combined with the concession that the Commissioner erred at step four of the sequential analysis, the matter must be reversed and remanded for a hearing to resolve these issues.

Id. at *18.

On May 1, 2013, a further hearing was held before ALJ Koennecke in accordance with the district court's remand order. R. at 658-66. Martin, again represented by an attorney, appeared and testified. Id.

On May 22, 2013, the ALJ issued a written decision again denying Martin's application for benefits covering the period between January 8, 2007 and March 31, 2011. R. at 588-607. This second unfavorable determination once again became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. Id. at 575-77. Because the parties are familiar with the underlying facts, they are discussed only to the extent necessary to address this appeal.

## III. DISCUSSION

### A. Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence and the correct legal standards were applied. Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). If the Commissioner's disability determination is supported by substantial evidence, that determination is conclusive. See id. Indeed, where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's decision must be upheld—even if the court's independent review of the evidence may differ from the Commissioner's. Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982); Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).

However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).

## B. Disability Determination—The Five-Step Evaluation Process

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition, the Act requires

that a claimant's:

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

The ALJ must follow a five-step evaluation process in deciding whether an individual is disabled.  See 20 C.F.R. §§ 404.1520, 416.920.  At step one, the ALJ m ust determine whether the claimant has engaged in substantial gainful activity.  A claimant engaged in substantial gainful activity is not disabled, and is therefore not entitled to benefits.  Id. §§ 404.1520(b), 416.920(b).

If the claimant has not engaged in substantial gainful activity, then step two requires the ALJ to determine whether the claimant has a severe impairment or combination of impairments which significantly restricts his physical or mental ability to perform basic work activities.  Id. §§ 404.1520(c), 416.920(c).

If the claimant is found to suffer from a severe impairment or combination of impairments, then step three requires the ALJ to determine whether, based solely on medical evidence, the impairment or combination of impairments meets or equals an impairment listed in Appendix 1 of the regulations (the "Listings").  Id. §§ 404.1520(d), 416.920(d); see also id. Pt. 404, Subpt. P, App. 1.  If the claimant's impairment or combination of impairments meets one or more of the Listings, then the claimant is "presumptively disabled."  Martone, 70 F. Supp. 2d at 149 (citing Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984)).

If the claimant is not presumptively disabled, step four requires the ALJ to assess

whether—despite the claimant's severe impairment—he has the residual functional capacity ("RFC") to perform his past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The burden of proof with regard to these first four steps is on the claimant.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

If it is determined that the claimant cannot perform his past relevant work, the burden shifts to the Commissioner for step five.  Perez, 77 F.3d at 46.  This step requires the ALJ to examine whether the claimant can do any type of work.  20 C.F.R. §§ 404.1520(g), 416.920(g).  The regulations provide that factors such as a claimant's age, physical ability, education, and previous work experience should be evaluated to determine whether a claimant retains the RFC to perform work in any of five categories of jobs:  very heavy, heavy, medium, light, and sedentary.  Perez, 77 F.3d at 46 (citing 20 C.F.R. § 404, Subpt. P, App. 2).  "[T]he Commissioner need only show that there is work in the national economy that the claimant can do; [she] need not provide additional evidence of the claimant's residual functional capacity."  Poupore, 566 F.3d at 306 (citing 20 C.F.R. § 404.1560(c)(2)).

## C.  ALJ's Decision Following Remand

The ALJ found Martin had not engaged in substantial gainful activity between January 8, 2007 and March 31, 2011, the period at issue.  R. at 591.  The ALJ next found plaintiff's anxiety disorder manifested by dizziness and degenerative disc disease of the cervical spine with right sided radiculopathy to be severe impairments.  Id.

Next, the ALJ concluded that Martin's combination of severe impairments did not meet or equal any of the Listings.  R. at 597.  Specifically, the ALJ appears to have considered Listings 1.02, 1.04, 11.02, 11.03, 12.00, and 12.06.  Id. at 597-600.

The ALJ then determined Martin retained the RFC to perform "light work" with certain restrictions:

> the claimant was able to lift/carry 20 pounds occasionally and 10 pounds frequently, sit for 6 hours in an 8 hour workday, stand/walk for 6 hours in an 8 hour workday, had no limitations on reaching, handling, fingering and feeling with the upper extremities, could occasionally engage in postural activities except for climbing ropes, ladders, and scaffolds. As to his mental residual functional capacity during the period in issue, the undersigned finds that the claimant was constantly capable of responding appropriately to supervision, coworkers and usual work situations and constantly capable of dealing with changes in a routine work setting. He was rarely unable to maintain concentration and only for very brief periods.

R. at 600.

Based on these findings and Martin's age, education, and work experience, the ALJ determined jobs existed in significant numbers in the national economy that plaintiff could have performed during the time period at issue. R. at 605-06. Accordingly, the ALJ concluded plaintiff had not been disabled within the meaning of the Act during the relevant period of time. Id. at 607.

## D. Plaintiff's Appeal

Martin argues the ALJ: (1) failed to conduct a "searching review" of the evidence; (2) "erroneously failed" to apply the proper standards for assessing medical evidence; (3) incorrectly determined his residual functional capacity; (4) improperly assessed his credibility; and (5) failed to support her Step Five determination with substantial evidence.

## 1. A "Searching Review" of the Evidence

First, Martin makes a generalized argument that the ALJ "either failed to consider or improperly represented various medical evidence of record" when considering his benefits

claim for the second time.  Pl.'s Mem. at 13.[3]  According to plaintiff, the ALJ "failed to consider all the evidence establishing the existence and impact of plaintiff's dizziness and black outs."  Id.

The non-adversarial nature of Social Security proceedings requires the ALJ "to investigate the facts and develop arguments both for and against granting benefits."  Sims v. Apfel, 530 U.S. 103, 111 (2000); see also Peed v. Sullivan, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991) (noting ALJ's "duty to conduct a searching review" of the record).

But "[a]n ALJ does not have to state on the record every reason justifying a decision . . . . nor discuss every piece of evidence submitted."  Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 448 (2d Cir. 2012) (quoting in part Black v. Apfel, 143 F.3d 383, 386 (8th Cir 1998)).

After careful review of the ALJ's written decision, this first argument is rejected.  As the Commissioner's brief details, the ALJ specifically determined, at step two, that Martin's "anxiety disorder manifested by dizziness" was a "severe" impairment.  R. at 591.  The ALJ then went on—for nearly six pages—to discuss various aspects of the medical evidence in the record gathered during the relevant time period.  Id. at 591-97.  This six-page discussion includes a number of specific references to plaintiff's continued claims of dizziness.  See, e.g., id. at 592 (noting treatment notes from between February and July 2007 indicated plaintiff "was also taking Meclizine for dizziness); id. at 593 (noting plaintiff was seen at hospital in August 2007 "for complaints of dizziness"); id. at 595 (discussing plaintiff's report of continued dizziness in June 2008); id. at 596 (noting emergency room visits in January

---

[3] Pagination corresponds with that assigned by CM/ECF.

and March of 2011 for dizziness).

The ALJ further considered Martin's claims of dizziness as part of the remaining steps in the sequential evaluation, which included a thorough analysis of the longitudinal medical evidence related to this particular complaint as well as the credibility of plaintiff's allegations of serious limitations arising from this recurring problem.  R. at 600-05.  The ALJ also made a specific finding about this issue at step five.  Id. at 606.

The propriety of each of those analyses and conclusions are the subject of more specific challenges by Martin and will be discussed in greater detail below.  However, to the extent plaintiff simply argues the ALJ failed to conduct a "searching review" of the evidence relevant to the time period at issue, that claim will be denied.

Martin's further argument in this section is that the ALJ failed to consider certain additional evidence generated after March 31, 2011, the end of the relevant time period at issue here.  Pl.'s Mem. at 16-17.

Of course, new evidence cannot be discounted merely because it was generated outside the time period at issue, since sometimes later-acquired evidence will shed light on, and be probative of, the severity of a claimant's condition during the earlier time period.  See Sergenton v. Barnhart, 470 F. Supp. 2d 194, 204 (E.D.N.Y. 2007); see also Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004) (noting later evidence may bear on Commissioner's evaluation where it "directly supports" claimant's earlier contentions of severity and "strongly suggests that, *during the relevant time period*, [claimant's] condition was far more serious than previously thought" (emphasis added)).

But nothing in the law or Regulations requires the ALJ to credit, or even give further consideration to, this sort of after-acquired evidence when it is determined to be irrelevant to

the time period at issue. In this case, the record reveals that the ALJ did precisely that—she considered plaintiff's additional evidence but ultimately chose to reject it, noting that the evidence in question was generated "after a demonstrated increase in cervical disc disease and a subsequent surgery." R. at 605; see also id. at 596 (noting this evidence demonstrated that plaintiff's symptoms "progressed from dizziness to syncopal spells and fainting" in 2011 and 2012).

In other words, the ALJ concluded that the later evidence submitted in this case did not, in fact, demonstrate that Martin's condition during the time period at issue here was of greater severity than the then-extant medical record had previously indicated. Rather, the ALJ concluded that the additional evidence substantiated only a later worsening in plaintiff's condition. Indeed, the ALJ specifically noted that the opinions and evidence that resulted in the later, favorable disability finding "occurred after a demonstrated increase in cervical disc disease and subsequent surgery." R. at 605.

This conclusion is not an unreasonable one. In fact, the substantial evidence standard recognizes that two fact-finders could reach opposite rulings that might both warrant affirmance. See, e.g., Rivera v. Colvin, 592 F. App'x 32, (2d Cir. 2015) (summary order) (rejecting claimant's assertion that after-acquired evidence should have been considered where a later award of benefits "reflected a worsening of [claimant's] condition, not a different assessment of the same evidence"). Accordingly, this argument will also be rejected.

### 2. Assessment of Medical Evidence

Martin next argues the ALJ failed to apply the proper standards for evaluating the medical evidence in the record. Specifically, plaintiff claims the ALJ should have afforded controlling weight to the determinations of his various treating physicians, who are allegedly

in agreement as to the disabling nature of plaintiff's various conditions.  Pl.'s Mem. at 17.

The Regulations broadly divide evidence from medical sources into three categories:  (1) treating; (2) acceptable; and (3) other.  The most important of these is a treating source, which includes a claimant's "own physician, psychologist, or other acceptable medical source" who has provided "medical treatment or evaluation and who has, or has had an ongoing treatment relationship" with the claimant.  Griffin v. Colvin, 2014 WL 296854, at *6 n. 11 (N.D.N.Y. Jan. 27, 2014) (Sharpe, C.J.) (citations omitted) (adopting Report & Recommendation of Hines, M.J.).

The reason for this importance is simple—the opinion of a treating source regarding the nature and severity of a claimant's impairments is entitled to *controlling* weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  Cobbins v. Comm'r of Soc. Sec., 32 F. Supp. 3d 126, 134 (N.D.N.Y. 2012) (Scullin, S.J.) (citations omitted) (adopting Report & Recommendation of Bianchini, M.J.).

However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  And when a treating source's opinion contradicts other substantial evidence, such as the opinions of other medical experts, an ALJ may afford it less than controlling weight.  Walker v. Colvin, 2013 WL 5434065, at *5 (N.D.N.Y. Sept. 27, 2013) (Sharpe, C.J.) (citation omitted) (adopting Report & Recommendation of Hines, M.J.).  Among other things, a treating physician's opinion may also be properly discounted, or even entirely rejected, when:  (1) it is internally inconsistent; (2) the source lacks underlying expertise; (3) the opinion is brief, conclusory, or unsupported by clinical findings; or even where (4) it "appears overly sympathetic such that

objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected." Id. (citations and footnotes omitted).

Where an ALJ decides to afford a treating physician's opinion less than controlling weight, he must still consider various factors in determining how much weight, if any, to give the opinion, including:  (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. §§ 404.1527(c), 416.927(c).

Beyond this so-called "treating physician rule" and its attendant exceptions, the same six factors set forth above apply with equal force to the evaluation of the remaining categories of medical evidence:  the "acceptable" and "other" sources mentioned earlier.

The former, those deemed "acceptable" by the Regulations, include "licensed physicians (medical or osteopathic doctors, psychologists, optometrists, podiatrists, and speech-language pathologists." Griffin, 2014 WL 296854 at *6 (footnote omitted).  The latter category, deemed "other" in Administration parlance, are "ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists." Id.

Importantly, it bears noting that only evidence from a treating or acceptable source can be relied upon to establish the *existence* of a medically determinable impairment. Griffin, 2014 WL 296854 at *6.  However, evidence from all three sources "can be considered when determining severity of impairments and how they affect individuals' ability to function." Id.

Finally, while the six-factor analysis set forth above applies in all cases except where

"controlling" weight is given to a treating physician's opinion, an ALJ need not mechanically recite these factors as long as the record reflects a proper application of the substance of the rule.  Petrie v. Astrue, 412 F. App'x 401, 407 (2d Cir. 2011) (summary order) (noting that an ALJ need not expressly recite each factor so long as it is "clear from the record as a whole that the ALJ properly considered" them).

### i. Dr. Camillo

The ALJ assigned "little weight" to the opinions of Dr. Camillo, concluding that his opinions were inconsistent with the opinion of Dr. Shapiro, a consultative psychiatric examiner.  R. at 605.  Martin attacks this finding by citing to assessments completed by Dr. Camillo in October 2008 and July 2009 that conclude plaintiff's dizziness would require him to be able to call off work without notice.  Pl.'s Mem. at 19.

Notably, Martin pressed this same challenge to the ALJ's treatment of Dr. Camillo's same assessments in the prior district court action.  Martin, 2012 WL 4107818, at *13 ("Plaintiff argues that the ALJ erred by using Dr. Shapiro's report as a basis to give little weight to Dr. Camillo's assessment.").

In the prior action, the Court rejected this argument.  Martin, 2012 WL 4107818, at *13-14 ("Substantial evidence supported the ALJ's determination to assign little weight to Dr. Camillo's assessment and, therefore, the ALJ did not err by making this determination.").

This time around, the ALJ made substantially the same findings regarding Dr. Camillo's assessments.  R. at 604-05.  Beyond that, the ALJ noted she was adopting her findings from her prior opinion regarding the appropriate weight to be assigned to Dr. Camillo's assessments.  R. at 605.  After an independent review of the record, there is no basis on which to disturb the ALJ's findings on remand with regard to Dr. Camillo's reports.

### ii. **Dr. Singam**

Martin also points to a March 2011 treatment record from Dr. Singam[4] that noted plaintiff "has difficulty sitting in a chair or a toilet as the shaking makes him fall on the ground." R. at 876. A few months later, on August 1, 2011, Dr. Singam authored a note indicating that plaintiff is "unable to attend work as he is bed-ridden at the present time" and that plaintiff's condition could be expected to remain constant "for the next 3-4 months." Id. at 848.

Aside from the fact that this is an opinion on an issue reserved to the Commissioner, Dr. Singam's August 2011 opinion was rendered outside the relevant time period in this case, which deals only with the question of Martin's disability between January 8, 2007 and March 31, 2011. See, e.g., Vilardi v. Astrue, 447 F. App'x 271, 272 (2d Cir. 2012) (summary order) (rejecting claimant's attempt to rely on medical opinion rendered approximately seven months after the relevant time period as being of "little value").

As discussed above, the ALJ made the requisite threshold inquiry into this after-acquired medical evidence and concluded it did not bear on the time period at issue. And an independent evaluation confirms that this medical opinion sheds no light whatsoever on the severity of claimant's condition during that time period. In other words, the ALJ did not err in failing to credit Dr. Singam's opinion here.

### iii. **Remaining Sources**

Martin also points to a June 2011 consultative examination by Dr. Sirotenko, R. at 1011-14, an August 2011 examination by Dr. Moehs, R. at 1055-56, and a February 2012

---

[4] Plaintiff claims a "Dr. Gueverra" made this assessment, but as the Commissioner notes, the record citation is to Dr. Singam's treatment note.

examination by Dr. VanDeWall.  R. at 1117-19.  But like Dr. Singam above, these opinions were rendered months after the relevant time period in this case, contain no indication that they are retrospective in nature, and, most importantly, were generated *after* the "change in [plaintiff's] physical and mental wellbeing" specifically acknowledged by the ALJ in this case.  R. at 605.  In sum, the ALJ did not err in concluding they were not relevant to the time period at issue here.

### 3. **Plaintiff's RFC**

Martin also argues the ALJ failed to consider the impact of his nonexertional limitations when calculating his RFC.  Pl.'s Mem. at 21.

A claimant's RFC is an assessment of "what an individual can still do despite his or her limitations."  Pardee v. Astrue, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (Mordue, C.J.) (citations omitted).  "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, [symptomatology], including pain and other limitations which could interfere with work activities on a regular and continuing basis."  Id. (citing 20 C.F.R. § 404.1545(a)).  "In practice, administrative law judges rely principally on medical source opinion and subjective testimony when assessing impaired individuals' ability to engage in work-related activities."  Casey v. Comm'r of Soc. Sec., 2015 WL 5512602, at *10 (N.D.N.Y. Sept. 15, 2015) (Suddaby, J.) (adopting Report & Recommendation of Hines, M.J.).

Martin's argument at this step is focused on the district court's remand order, which plaintiff claims directed the Commissioner "to consider the impact of [plaintiff's] nonexertional impairments, imposed by dizziness and his daily treatment regime, on his ability to work."  Pl.'s Mem. at 21 (citing R. at 728).  To be precise, the district court stated

Further, Plaintiff argues that the ALJ failed to incorporate "the multiple actions Plaintiff takes daily to manage his neck pain and to follow his doctor's instructions." Pl. Br. at 19. These consist of "home physical therapy, us[ing] a traction unit, and alternate[ly] applying ice packs and heat packs to his neck." Id. Plaintiff contends that he would be unable to work "for significant portions of the work day when performing these activities to manage his pain." Id. Defendant contends that, based on evidence that Plaintiff's physical therapy sessions (consisting of applying heat packs, traction, and stretching) lasted no more than 20 to 30 minutes, see Tr. 549-57, 563-66, 568-70, the ALJ could have concluded that Plaintiff would not need to perform "home physical therapy" exercises at work but instead could perform these activities before work, after work, or during work breaks. Again, the record is not developed in this regard and this Court is not in the position to infer what the ALJ might have considered or concluded.

Martin, 2012 WL 4107818, at *17.

The ALJ's written decision following remand responds directly to the district court's stated concerns. In fact, the ALJ discussed both the medical and testimonial evidence regarding Martin's home treatment regimen at length before concluding that plaintiff's claim that it lasted "all day long" throughout the period at issue was simply not credible. R. at 602.

The ALJ reached this conclusion by noting that at the prior hearing, Martin testified "that he did home physical therapy about once per day and used the traction device for about ten minutes." R. at 602. The ALJ further noted that, at least at this first hearing, plaintiff omitted any comments about "using ice/heat 2-3 times a day." Id. A review of the hearing transcript reveals that these observations are correct:

Q.    Now, are you doing any home physical therapy?

A.    Yes.

Q.    And how often do you do that?

A.    Roughly once a day. I can only do it once a day?

Q.    And how long do you do it for?

A.    Well, it's a traction unit I just got from physical therapy and I
      can only do it for 10 minutes a time.  10 minutes a day at a
      time.

. . . .

A.    And they say they'd rather have me [do] that at home instead
      of having to go to therapy for the rest of my life is what they
      told me.

Q.    So are you going to any therapy now?

A.    No.  They gave me this traction unit for lifetime at home and
      if it doesn't - - if I get worse the way I was before they would
      like me to contact [an orthopedist] and they were talking of
      injections or acupuncture or something in my neck.

Q.    And at one time you had some sort of electronic stimulation.
      Is that something that's used now or is that - -

A.    No.  They're all done with that.  I couldn't have traction back
      then.  It was too intense for me.

R. at 779.

      The ALJ then noted that, at the post-remand hearing, Martin testified to a much more

extensive home treatment regimen, including using "ice/heat 2-3 times a day for 15-30

minutes," "home physical therapy about once per day," and use of the traction device "for

about ten minutes."  R. at 602.  As before, the ALJ's observations are correct:

Q.    Well, how about like therapy at home, did you do therapy at
      home?

A.    Yeah.  That was the, the, the heat, and the ice and cervical
      traction unit.

Q.    And on a typical day how much time would you spend on this,
      this therapy at home?

A.    Oh.  There would be days it would be all day long, you know.

I mean, from the time I get up I'd use ice and then if that didn't work I'd be throwing heat on and then I'd try my cervical traction unit. And, and then other days it was just maybe two or three times a day with the ice and the heat. I'd put ice on for the selling and, and heat on for - - to loosen it all back up for it wouldn't be tight and - -

Q.    But now, on the days when it was like two or three times a day, how long would a regimen last when you were trying to do this? How much time, like five minutes, ten minutes?

A.    How long would I use it?

Q.    Did you - - yes.

. . . .

A.    Well, on a mild day it would be between three and four times a day[ ], besides my cervical traction unit that I was using.

Q.    And how much time would you spend using that cervical traction unit?

A.    I could only use that once a day. They, they wouldn't let me - -

Q.    And when you use it, how long would you use it for?

A.    It was ten minutes at a time.

R.  at 663-65.

Ultimately, the ALJ gave "little weight" to Martin's testimony of an extensive home treatment regimen that was completed "daily" or "all day long" during the relevant time period. R. at 602. In particular, the ALJ noted that using ice and heat two or three times a day for fifteen to thirty minutes is not "all day long." Id. Further, and more responsive to the district court's decision ordering remand, the ALJ concluded that plaintiff's treatment regimen "can be accommodated during regular work breaks (morning and afternoon) and lunch, or before and after work." Id.

The ALJ also reviewed the medical record "with an eye towards reports from the claimant of his performing these [home treatment] activities daily." R. at 602. Among other things, the ALJ noted that despite Martin's testimony of constant application of ice and heat, there were few instances in the medical record reflecting that plaintiff self-reported this kind of treatment regimen, a notable fact given that plaintiff claimed such treatment "was a large part of his daily life." Id. at 602-03.

Equally importantly, the ALJ concluded that the three different courses of physical therapy prescribed to, and completed by, plaintiff during the time period in issue could have been completed before or after work, during a lunch hour, or even on weekends. R. at 603. In other words, as the ALJ concluded, this treatment regimen "would not have been so disruptive as to preclude all work." Id.

To be sure, the conclusions the ALJ ultimately reached on these issues following the district court's remand order are not the favorable ones that Martin would have liked the ALJ to have reached. And, as is often the case when conducting this type of review, they are not necessarily the conclusions that a different factfinder, considering the same record, might have reached. But while they may be deemed susceptible to more than one rational interpretation, they are nevertheless based on substantial evidence and therefore will be affirmed.

Martin further argues the ALJ erred "by failing to ascribe mental health limitations." Pl.'s Mem. at 22. On this point, plaintiff argues the ALJ's earlier findings of "mild" and "moderate" limitations "early in the decision" cannot be squared with her later conclusion that "plaintiff's ability to work was not impacted by nonexertional limitations." Id.

This argument must be rejected. As the Commissioner points out, the findings of

which Martin complains were made at, and are relevant to, steps two and three of the

five-step disability determination process.  Def.'s Mem. at 14-15; <u>see also</u> R. at 599 (noting

the limitations identified in this section "are not a residual function capacity assessment but

are used to rate the severity of mental impairments at steps 2 and 3 of the sequential

evaluation process").

Where, as here, "mental impairments are at issue, the Commissioner directs

administrative adjudicators to employ a 'psychiatric review technique' (sometimes referred to

as a 'special technique')." <u>Wilson v. Colvin</u>, 2015 WL 1609727, at *4 (N.D.N.Y. Apr. 10,

2015) (Sharpe, C.J.) (adopting Report & Recommendation of Hines, M.J.) (citing 20

C.F.R. §§ 404.1520a(b)(e), 416.920a(b)-(e)).

"This technical method helps administrative law judges first determine whether

claimants have medically-determinable mental impairments." <u>Wilson</u>, 2015 WL 1609727, at

*4 (footnote omitted).  "This technique also enables administrative law judges to determine

subsequently whether medically-determinable mental impairments are severe (a Step 2

issue) and whether they meet or are equivalent in severity to any presumptively disabling

mental disorder (a Step 3 issue)." <u>Id.</u>

As relevant here, ALJs determine whether a claimant's severe mental impairments

meet or equal any of the presumptively disabling impairments listed in Appendix 1 of the

Regulations[5] by applying what are commonly referred to as the "paragraph B

criteria." <u>Wilson</u>, 2015 WL 1609727, at *5.

---

[5] "Impairments listed in Appendix 1 of the Regulations are acknowledged by the [Commissioner] to be of sufficient severity to preclude substantial gainful activity." <u>McGregor v. Astrue</u>, 993 F. Supp. 2d 130, 136 (N.D.N.Y. 2012) (McAvoy, S.J.) (alteration in original) (adopting Report & Recommendation of Bianchini, M.J.).  "Accordingly, a claimant who meets or equals a Listing is 'conclusively presumed to be disabled and entitled to benefits.'" <u>Id.</u> (quoting <u>Dixon v. Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995)).

These criteria are divided into four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. See 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The Regulations require ALJs to rate the first three of these functional areas as "[n]one, mild, moderate, marked, [or] extreme," §§ 404.1520a(c)(4), 416.920a(c)(4), while the fourth category (episodes of decompensation) must be rated on a five-point scale. Id.

In Martin's case, the ALJ considered these paragraph B criteria and concluded plaintiff: (1) suffered from moderate restriction in activities of daily living; (2) experienced mild difficulties in social functioning; (3) experienced no difficulties in concentration, persistence, or pace; and (4) had suffered no episodes of decompensation of extended duration. R. at 598-99.

These findings are supported in the ALJ's written decision with a brief narrative discussion and include citations to various pieces of record evidence. With respect to activities of daily living, the ALJ noted, among other things, that although Martin's testimony on remand "minimized his activities of daily living" and thereby suggested "an extreme limitation on functioning in this area," a review of the medical evidence "documents that, during the period in issue, the claimant went hunting and fishing, 'puttered' in the yard, spent time with his granddaughter, cared for his personal needs without assistance, prepared simple meals, washed dishes, washed clothes, enjoyed being outdoors and drove a car. R. at 598.[6]

---

[6] "Activities of daily living 'include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." McGregor, 993 F. Supp. 2d at 138 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(1)).

With respect to social functioning, the ALJ noted Martin spent significant amounts of time with his granddaughter and wife during the period in issue, and was able to attend family gatherings "without incident." R. at 599. Further, the ALJ noted that plaintiff's interactions with his medical providers were "consistently appropriate," that plaintiff reported being able to take public transportation, and that he was generally "able to leave home as wanted or necessary during the period in issue." Id.[7]

Martin attempts to challenge these findings on appeal by listing several pieces of evidence in the record that he believes support alternative conclusions. But this argument "essentially invite[s] the court to re-weigh evidence and come to a different conclusion than did [the] ALJ." Wilson, 2015 WL 1609727, at *4. That invitation must be declined, since a reviewing court "defer[s] to the Commissioner's resolution of conflicting evidence." Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012). Accordingly, this argument will be rejected.

### 4. Credibility Assessment

Martin next argues the ALJ failed to conduct a renewed credibility analysis following remand and claims "new evidence has now been submitted which more strongly bolster's plaintiff's testimony." Pl.'s Mem. at 24.

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the

---

[7] "'Social functioning' refers to the claimant's 'capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals' and includes 'the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.'" McGregor, 993 F. Supp. 2d at 138 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(2)).

determination is supported by substantial evidence.'" Lewis v. Apfel, 62 F. Supp. 2d 648,

651 (N.D.N.Y. 1999) (quoting Gallardo v. Apfel, No. 96-CV-9435, 1999 WL 185253, at *5

(S.D.N.Y. Mar. 25, 1999)).

Where the record evidence does not fully support a claimant's testimony, the ALJ

must employ a two-step analysis to evaluate the claimant's reported symptoms. See 20

C.F.R. § 404.1529; SSR 96-7p. First, the ALJ must determine whether, based on the

objective medical evidence, a claimant's medical impairments "could reasonably be expected

to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); SSR 96-7p.

Second, if the medical evidence establishes the existence of such impairments, the ALJ must

evaluate the intensity, persistence, and limiting effects of those symptoms to determine the

extent to which the symptoms limit the claimant's ability to do work. See id.

At this second step, the ALJ must consider: (1) the claimant's daily activities; (2) the

location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3)

precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of

any medication the claimant takes or has taken to relieve his pain or other symptoms; (5)

other treatment the claimant receives or has received to relieve his pain or other symptoms;

(6) any measures that the claimant takes or has taken to relieve his pain or other symptoms;

and (7) any other factors concerning claimant's functional limitations and restrictions due to

his pain or other symptoms. 20 C.F.R. § 416.929(c)(3)(I)-(vii); SSR 96-7p.

Importantly, an ALJ "must discuss the relationship between the plaintiff's medically

determinable impairment, the plaintiff's reported symptoms, his conclusions regarding the

plaintiff's functioning, and why the plaintiff's reported symptoms are or are not consistent with

the evidence in the record." Deeley v. Astrue, 2011 WL 454505, at *5 (N.D.N.Y. Feb. 3,

2011) (Scullin, S.J.) (citing SSR 95-5p).

It is unclear why Martin believes the ALJ completely dismissed his additional testimony and simply adhered to her prior credibility finding, since the record demonstrates otherwise. In fact, the ALJ's written decision faithfully describes the substance of plaintiff's testimony at the post-remand hearing as well as that of his prior testimony:

> At the post remand hearing, the claimant testified that prior to April 1, 2011, he had dizziness every day, that it was "constant", and had increased symptoms with "any activity" including using his arms. The claimant testified at the prior hearing that he was married, but separated from his wife. He was observed as having no problem raising his hand to be sworn in. He can drive a car "a little", but in 2007 and 2008 he could not drive because his symptoms were ten times worse than he is now and he could barely get out of bed. With regard to his anxiety, the claimant testified at the prior hearing that he does not like being around people and goes to the store early . . . .

R. at 600-01.

The ALJ's written decision then proceeds, in significant detail, to explain why Martin's allegations of constant, severe, completely disabling dizziness *during the relevant time period* were not substantiated by the medical evidence in the record. R. at 601-02. The ALJ's analysis on this issue includes, among other things, numerous citations to medical reports indicating fairly normal physical findings, doctor's reports noting both that plaintiff's symptoms "are not constant" and that "some symptom magnification" may be present, and reports indicating that plaintiff was able to independently complete various activities of daily living. Id.

Further, whether or not hunting was prescribed by a therapist as a stress management technique, Pl.'s Mem. at 15, the ALJ was entitled to note that Martin's apparent ability to even occasionally do so would tend to undermine a claim that the disabling dizziness was

- 24 -

"constant," or completely unrelenting, during the relevant time period.

Importantly, "[a] federal court must afford great deference to the ALJ's credibility finding, since the ALJ had the opportunity to observe [the claimant's] demeanor while [the claimant was] testifying." Kessler v. Colvin, 48 F. Supp. 3d 578, 595 (S.D.N.Y. 2014) (citation and internal quotation marks omitted).

In this case, the ALJ had not one, but two separate opportunities to make such observations while Martin explained his alleged symptomatology during the relevant time period. And while plaintiff might prefer otherwise, relying in part on prior observations of a witness such as the claimant to assess credibility does not amount to an error under this deferential standard.

Martin's argument here again seems to be based on his erroneous belief that he is entitled to benefits during the time period at issue more or less because a different ALJ agreed that he became disabled as of a later date. See Pl.'s Mem. at 25 ("What's more, the Administration has already affirmed that plaintiff's conditions were disabling as of April, 2011, *based on the exact same symptoms complex*. It is untenable to assert that plaintiff was lying and exaggerating about these same conditions all the way up until 2011, but then the symptoms he was complaining about all along suddenly became legitimate.").

But again, the ALJ concluded that the after-acquired evidence here largely substantiated a *worsening* in Martin's condition, rather than a constant state of disability. And in fact, even the ALJ recognized that her adverse credibility finding did not mean that plaintiff was simply "lying" about his symptoms during the time period at issue in this case. R. at 603 ("[T]his does not mean that the claimant had no pain or other symptoms during the period in issue."). Although plaintiff's arguments on this point have some force, an

application of the deferential substantial evidence standard directs a conclusion that the Commissioner's decision should be affirmed.

### 5. **Step Five Finding**

Finally, Martin argues that his nonexertional limitations precluded the ALJ from relying on the Medical-Vocational Guidelines to determine whether he was disabled during the period in issue. Pl.'s Mem. at 27.

At Step Five, the Commissioner must determine whether there are significant numbers of jobs that exist in the national economy that the claimant can perform. See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). "An ALJ may make this determination either by applying the Medical Vocational Guidelines [the Grids] or by adducing testimony of a vocational expert." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014).

However, reliance on the Grids is inappropriate where a claimant's nonexertional impairments "significantly" diminish the claimant's ability "beyond that caused by his or her exertional limitations." Martin, 2012 WL 4107818, at *17 (citation omitted); see also Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013).

Where, as here, an ALJ relies on the Grids rather than the testimony of a vocational expert, the ALJ must explain why a claimant's nonexertional limitations would not have a significant impact on the range of work otherwise permitted by that claimant's exertional limitations. Chaparro v. Colvin, –F. Supp. 3d–, 2016 WL 213430, at *18 (S.D.N.Y. Jan. 19, 2016).

In this case, Martin argues the ALJ tried to "get around this" limitation on the proper usage of the Grids by concluding that his nonexertional impairments imposed "little or no effect on his occupational base." Pl.'s Mem. at 27. Again, accepting this argument would

amount to second-guessing the ALJ's decision, which concluded that "[r]are, brief periods of inattention due to dizziness would not constitute a significant diminution of the ability to perform the mental demands of unskilled work." R. at 606.

Martin clearly disagrees with this conclusion, but it is ultimately the ALJ's responsibility to "choose between properly submitted medical opinions and other competent evidence to piece together an overall [RFC] assessment." <u>Crofoot v. Comm'r of Soc. Sec.</u>, 2013 WL 5493550, at *8 (N.D.N.Y. 2013). The ALJ built on her earlier, permissible conclusions regarding plaintiff's limitations, such as her RFC finding that plaintiff "was rarely unable to maintain concentration and only for very brief periods," to ultimately conclude that plaintiff was not disabled at this step. Accordingly, plaintiff's final argument will be rejected.

## IV. <u>CONCLUSION</u>

In sum, because the ALJ applied the correct legal standard and her decision is supported by substantial evidence, the Commissioner's decision denying Martin disability benefits during the period at issue will be affirmed and the complaint will be dismissed.

Therefore, it is

ORDERED that

1. Martin's motion for judgment on the pleadings is DENIED;

2. The Commissioner's motion for judgment on the pleadings is GRANTED;

3. The Commissioner's decision is AFFIRMED; and

4. Martin's complaint is DISMISSED.

The Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

United States District Judge

Dated: April 7, 2016
       Utica, New York.